## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| BENJAMIN BAKER individually and on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br>v.<br><br>EQUIFAX, INC.,<br><br>                    Defendant. | **Case No.:**<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

Plaintiff Benjamin Baker ("Plaintiff"), individually and on behalf of the class defined below, brings this Class Action Complaint ("Complaint") against Equifax, Inc. ("Equifax" or "Defendant"), and alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel as follows:

### I.    INTRODUCTION

1.    Equifax is a global data, analytics, and technology company best recognized by consumers as one of the largest and most relied-upon consumer reporting agencies in the country. Equifax derives a substantial part of its $4.9 billion annual revenue by providing lenders information concerning the creditworthiness of prospective borrowers. Equifax collects information regarding a consumer's financial behavior and compiles it into credit reports which it then

sells to lenders.[1] Borrowers with a history of timely payments, low revolving credit balances, and established credit histories will generally receive a higher credit score based on the information relayed in their credit reports. Lenders in turn will offer lower interest rates and preferable terms to borrowers with higher credit scores. Equifax compiles credit scores on approximately 200 million consumers and recognizes its impact on their financial health. As Equifax acknowledges, its "unique data and analytics change millions of lives across the world."[2] Unfortunately for borrowers and lenders who relied upon Equifax to provide reliable and accurate credit reports, that change was for the worse.

2.     On August 2, 2022, Equifax publicly confirmed that due to a "glitch" in its technology systems, the company provided inaccurate credit scores to lenders about potentially millions of individuals who applied for credit from mid-March through early April (hereinafter "the Glitch"). (*See* "*Equifax Sent Lenders Inaccurate Credit Scores on Millions of Customers*" article dated August 2, 2022).[3]

3.     In many cases the Glitch caused credit scores to be off by 25 points or more, an error that resulted in borrowers being denied loans or paying higher

---

[1] See 15 U.S.C. § 1681a(d) (defining "consumer report"); see also 15 § U.S.C. 1681 (recognizing "a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy")

[2] https://www.equifax.com/about-equifax/who-we-are/

[3] Andrew Ackerman and AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, WALLST.J (Aug. 2, 2022), available at: https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483.

interest rates than they would have had their lenders been provided accurate information.[4]

4.    To prevent this very harm, consumer reporting agencies like Equifax are subject to federal regulations. The Fair Credit Reporting Act ("FCRA")[5] was enacted ''to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.''[6]

5.    Among other things, the FCRA "require[s] that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C.A. § 1681(b).[7]

6.    The Consumer Financial Protection Bureau ("CFPB") has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report."[8]

---

[4] *Id.*
[5] Equifax is a consumer reporting agency, as defined by the Fair Credit Reporting Act, 16 U.S.C. § 1681, et seq. ("FCRA")
[6] Guimond v. Trans Union Credit Info., 45 F.3d 1329, 1333 (9th Cir.1995) (citations omitted).
[7] *Id.*
[8] *Id.*

7.    Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA. Equifax's maintenance, use, and furnishing of consumer reports is and was intended to affect Plaintiff and other Class Members, each of whom was individually identifiable by Defendant, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax. Moreover, Equifax was aware of the importance of providing accurate credit scores and the fact that lenders and borrowers relied on the accuracy of its reports when making financial decisions.

8.    The damages that Plaintiff and Class Members suffer as a result of the Glitch cannot be rectified by merely updating the affected credit reports. In addition, while credit reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same credit reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

9.    Defendant's actions or inactions that allowed for the Glitch are also a violation of its duties and obligations as a credit reporting agency under the FCRA, as described in detail herein. Each instance in which Equifax has failed to comply

with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

10.    Equifax continued to provide inaccurate credit scores and consumer reports when it knew or should have known that Plaintiff's and Class Member's consumer reports and credit scores were inaccurate. Additionally, Equifax failed to alert consumers of the Glitch and its impact when it discovered it months ago. Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

11.    This action seeks to hold Defendant accountable for its conduct and seeks recompense and injunctive relief on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

12.    Plaintiff seeks to recover FCRA statutory damages to the fullest extent allowable by law. In addition Plaintiff also seeks injunctive relief requiring Defendant to, inter alia, (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Glitch; (ii) identify and notify each U.S. citizen who was affected by the Glitch; (iii) provide a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes; (iv) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time

and out-of-pocket expenses they incurred as a result of the Glitch; (iv) disgorge its gross revenue from transactions, including but not limited to the revenue derived from selling inaccurate consumer reports and credit scores to business clients and the earnings on such gross revenue; and (vi) discontinue its above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the causes of the Glitch.

13.    Plaintiff and Class Members have standing to sue as a result of Equifax's violations of federal and state statutes, including the FCRA, as detailed herein. Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Glitch. Plaintiff and Class Members have suffered actual injury, have suffered (and will continue to suffer) economic damages and other injury and actual harm as described herein.

## II.    JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because Plaintiff and at least one member of the putative Class, as defined below, are citizens of a different state than Defendant Equifax, there are more than 100 putative class members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

15.    This Court has personal jurisdiction over Equifax because it maintains its principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia,

regularly conducts business in Georgia, and has sufficient minimum contacts in Georgia. Defendant intentionally availed itself of this jurisdiction by conducting their corporate operations in Georgia.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Equifax's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

### III.    PARTIES

**Plaintiff**

17.     Plaintiff Benjamin Baker is and was a citizen and a resident of Austin, Texas during the relevant time period.

18.     Plaintiff Baker refinanced the mortgage on his residence in or about March or April of 2022. Plaintiff Baker regularly monitored his credit score and anticipated that he would receive a favorable interest rate as a result of his excellent credit history.

19.     Before refinancing his home, Plaintiff Baker reviewed his credit score and it showed approximately 760. And when Plaintiff Baker's lender performed a "soft pull" on his credit history, the results indicated that he should anticipate an interest rate of approximately 3.99%, in line with his expectations based on a credit score of 760.

20.     However, when the lender subsequently pulled and reviewed his credit report, which included erroneous information provided by Equifax, his credit report dropped forty points to 720 and his offered rate subsequently rose a quarter of a percent, to 4.25%.

21.     Plaintiff reviewed the credit report provided to his lender and was unable to determine, based on the activity recorded therein, why his reported credit score was forty points lower than that which he previously reviewed. Unable to find any information in the credit report to contest, Plaintiff accepted the higher interest rate on the loan.

22.     A month or two later, Plaintiff again reviewed his credit report and it showed his credit score to be approximately 760, forty points higher than when he entered into his loan agreement.

23.     As a result of Defendant's failure to provide an accurate credit score, Plaintiff Baker was forced to accept an interest rate at least a quarter percent higher than his creditworthiness reflected and he has suffered damages in the form of overpayments towards a higher rate loan.

24.     Plaintiff will continue to suffer harm throughout the thirty year term of his loan and when he applies for future credit unless Defendant is ordered to rectify the harm alleged herein.

**Defendant**

25.    Defendant Equifax, Inc. is incorporated in Georgia with its headquarters and principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309. It is a citizen of Georgia.

26.    Equifax is one of the major credit reporting agencies in the United States. As a credit reporting agency, Equifax maintains information related to the credit history of consumers and provides the information to financial lenders and commercial creditors who are considering a borrower's application for credit or who have extended credit to the borrower. As a credit reporting agency, Equifax is engaged in a number of credit-related services and supplied over 2.1 billion credit card files to lenders in 2021.[9]

## IV.    FACTUAL ALLEGATIONS

**Lenders relied on Inaccurate Credit Reports for Millions of Consumers**

27.    On May 27, 2022, reporting first emerged that Equifax, one of the country's three largest consumer credit reporting agencies, had provided inaccurate credit scores on millions of U.S. consumers seeking loans during March and April

---

[9] See Equifax Company Profile, Equifax, http://www.equifax.com/about-equifax/company-profile (last visited August 7, 2022)

of 2022. (*See Equifax Telling Lenders of Potential Errors in Credit Scores*, article dated May 27, 2022).[10]

28.     According to public reporting in May of 2022, the Glitch occurred when Equifax experienced a "coding issue introduced during a technology change to its legacy online model platform may have resulted in the miscalculation of certain credit attributes for about 12% of credit scores."[11]

29.     According to reports from consumers and public reporting, Equifax sent the erroneous scores on people applying for auto loans, mortgages and credit cards to banks and nonbank lenders related to individuals applying for lines of credit.[12]

30.     The scores were sometimes off by 20 points or more in either direction, according to public reporting, "enough to alter the interest rates consumers were offered or to result in their applications being rejected altogether."[13]

---

[10] Steve Goode, *Equifax Telling Lenders of Potential Errors in Credit Scores*, National MortgageProfessional.com (May 27, 2022), available at https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores

[11] *Id.*

[12] *Id.*

[13] *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers.* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483

31.    However, upon information and belief, some scores were inaccurate by as much as 130 points.

32.    According to public reporting, "[t]he inaccurate scores were sent from mid-March through early April." Despite the importance of accuracy in consumer credit reporting, Equifax only began disclosing the errors to lenders in May.[14]

33.    In a statement on May 27, 2022, Equifax officials acknowledged "there had been a coding issue within a program slated for replacement, and that it may have resulted in a potential miscalculation of certain attributes used in model calculations."

34.    Further, Equifax allegedly acknowledged in May 2022, to resellers and lenders that for some transactions, certain attribute values — such as "number of inquiries within one month" or "age of oldest tradeline" — were potentially incorrect.[15]

35.    Despite that alleged private acknowledgment, Equifax publicly stated that "credit reports" were not affected. However, as discussed below, items included on credit reports, including the credit score itself, are vital aspects of a consumer report.

---

[14] *Id.*

[15] *Equifax Telling Lenders of Potential Errors in Credit Scores, National MortgageProfessional.com*, https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores

36.    In May of 2022, Defendant Equifax said data quality and accuracy are at the heart of everything Equifax does and they "take this technology issue very seriously."[16]

37.    Mark Begor, Equifax's chief executive, publicly acknowledged the Glitch at a June investor conference, calling it a coding issue that affected "legacy applications that resulted in some scores going out that had incorrect data." He then said the company had fixed the problem and takes issues with its data quality seriously.[17]

38.    Despite the fact that millions of consumers had inaccurate information provided to lenders, "[t]he impact is going to be quite small," Mr. Begor said, "not something that's meaningful to Equifax." [18]

**Equifax has a Duty to Ensure Credit Reports are as Accurate as Possible**

39.    Equifax is one of the major credit reporting agencies in the United States as defined in the FCRA. 15 U.S.C. § 1681a(f).

---

[16] *Id.*

[17] *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers.* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483

[18] *Equifax Telling Lenders of Potential Errors in Credit Scores,* National MortgageProfessional.com, https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores

40.     As a credit reporting agency, Equifax generates and sells consumer reports or "credit reports" containing consumer information and details of a consumer's credit history to businesses and its recurring clients.

41.     Consumer reports are used by parties to determine whether and on what terms a consumer will be offered credit, including credit cards, student, car, and small business loans, mortgages, rental housing, and insurance.

42.     The FCRA defines consumer reports as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" in lending decisions.[19]

43.     As described by Equifax, "[b]usinesses rely on us for consumer and business credit intelligence, credit portfolio management, fraud detection, decisioning technology, marketing tools, and human resources-related services. We also offer products that enable individual consumers to manage their financial affairs and protect their identity."[20]

---

[19] 15 U.S.C. § 1681a, *et seq*
[20] *Id*. at 12

44.     Prior to the Glitch, Equifax promised its customers and everyone about whom it collects consumer data that it would deliver accurate information about consumers. Equifax's privacy policy stated, in relevant part: "We have built our reputation on our commitment to deliver reliable information to our customers (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers."[21]

45.     Because of the importance of consumer report accuracy to businesses and consumers, the structure of the FCRA creates interrelated legal standards and requirements to support the policy goal of accurate credit reporting.[22]

46.     Among these is the requirement that, when preparing a consumer report, consumer reporting agencies ''shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.''[23]

47.     Further, the FCRA places strict obligations on credit reporting agencies, such as Equifax, when it comes to maintaining the accuracy of consumer credit reports. According to the CFPB, "[a]ccuracy in consumer reports is of vital

---

[21] http://www.equifax.com/privacy/ (last accessed Aug. 7, 2022).
[22] Bureau of Consumer Fin. Prot.,Fair Credit Reporting; Name-Only Matching Procedures, 86 FR 62468 (Nov. 10, 2021), available at https://files.consumerfinance.gov/f/documents/cfpb_fair-credit- reporting_advisory-opinion_2022-07.pdf
[23] 15 U.S.C. 1681e(b).

importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers.[24]

48.    Section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

49.    This includes maximum possible accuracy with respect to the information that is included on an individual's consumer report – including, but not limited to the credit score itself.[25]

50.    The Bureau has recently affirmed that, "[i]n preparing consumer reports, it is not a reasonable procedure to assure maximum possible accuracy" if a consumer reporting agency uses "insufficient identifiers to match information to the consumer who is the subject of the report." [26]

51.    Equifax is allowed to perform credit reporting services, involving such sensitive consumer credit information, only if it adheres to the requirements of laws meant to protect the privacy and accuracy of such information, such as the FCRA. Equifax's maintenance, use, and furnishing of consumer reports is and was

---

[24] Bureau of Consumer Fin. Prot., Fair Credit Reporting; Name-Only Matching Procedures, 86 FR 62468, 62468 (Nov. 10, 2021).

[25] 3 Consumer Fin. Prot. Bur., Fair Credit Reporting: Permissible Purposes for Furnishing and Using and Obtaining Consumer Reports, 87 FR 41243 (Jul. 7, 2022), available at https://www.federalregister.gov/d/2022-14823/p-41.

[26] *Id*.

intended to affect Plaintiff and other Class Members, and the harm caused by the inaccuracies on consumer reports resulting from the Glitch was entirely foreseeable to Equifax.

**Consumers are Irreparably Harmed by Inaccurate Credit Reporting**

52.    Equifax acknowledges that, as a consumer reporting agency, it "impact[s] some of life's most pivotal moments."[27] Accordingly, the requirement of maximum possible accuracy in consumer reports "remains as important today as it was when the statute was enacted in 1970."[28]

53.    Indeed, according to the CFPB, "inaccurate information in consumer reports can have significant adverse impacts on consumers. These impacts are particularly concerning for prospective renters and job seekers struggling to recover from the impacts of the COVID–19 pandemic."

54.    The CFPB recently raised concerns that "[c]onsumers with inaccurate information in their consumer reports may, for example, be denied credit or housing they would have otherwise received, or may be offered less attractive terms than they would have been offered if their information had been accurate."[29]

---

[27] https://www.equifax.com/about-equifax/who-we-are/
[28] Bureau of Consumer Fin. Prot.,Fair Credit Reporting; Name-Only Matching Procedures, 86 FR 62468, 62469 (Nov. 10, 2021), available at https://files.consumerfinance.gov/f/documents/cfpb_fair- credit-reporting_advisory-opinion_2022-07.pdf
[29] Bureau of Consumer Fin. Prot.,Fair Credit Reporting; Name-Only Matching Procedures, 86 FR 62468, 62469 (Nov. 10, 2021), available at https://files.consumerfinance.gov/f/documents/cfpb_fair-credit- reporting_advisory-opinion_2022-07.pdf.

55.     These concerns were realized for the millions of individuals, including Plaintiff and Class Members, who were denied credit or housing that they would have otherwise received, or were offered less attractive terms than Plaintiff and Class Members would have received had their information been accurate.

56.     Initially, it appeared as if the Glitch was limited to individuals who applied for mortgages, and the "company said that less than 9% experienced a change of 10 points or less; less than 3% experienced a change of 11 to 20 points; and less than 1% experienced a change of more than 20 points."[30]

57.     However, further reporting in August revealed that the issue was not limited to individuals who applied for mortgages, and that the inaccurate consumer reports provided by Equifax "affected many lenders across multiple consumer loan products, not just mortgages, according to people familiar with the matter."[31]

58.     As reported by the Wall Street Journal in August of 2022,

The percentage of incorrect scores provided to lenders varied, [people familiar with the matter] said. At one big bank, for example, 18% of applicants during the threeweek period had incorrect scores, with an average swing of 8 points.
[ . . .]
Equifax told one large auto lender that about 10% of applicants during the three-week period had inaccurate scores, according to a person familiar with the matter. Of those, several thousand saw a change of 25

---

[30]   *Equifax Telling Lenders of Potential Errors in Credit Scores,* National MortgageProfessional.com,   https://nationalmortgageprofessional.com/news/equifax-telling-lenders-potential-errors-credit-scores
[31]   *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers.* https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483

points or more on their credit score, the person said. In a small number of cases, applicants went from having no credit score at all to a score in the 700s—or vice versa, the person said. The most widely used credit scores range between 300 to 850; the higher the credit score, the more likely an applicant will get approved and at a lower interest rate.[32]

59.    Nearly 25 million credit reports were requested from the three major credit reporting agencies during the Glitch and thus it is likely that hundreds of thousands, if not millions, of consumers were harmed by Equifax's actions and inactions.

60.    As a result of the inaccurate reporting of their consumer credit information, Plaintiff and Class Members have experienced, without limitation, the following injuries:

- loss of use of and access to financial accounts and/or credit;

- money and time expended to avail themselves of assets and/or credit frozen or flagged due to inaccuracies;

- impairment of their credit scores, ability to borrow, and/or ability to obtain credit;

- lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

- money, including fees charged in some states, and time spent placing fraud alerts and security freezes on their credit records;

---

[32] *Id.*

- costs and lost time obtaining credit reports in order to monitor their credit records to attempt to understand the reasoning behind the denials due to the Glitch;

- lost opportunity costs and loss of productivity from efforts to mitigate and address the adverse effects of the Glitch, including but not limited to efforts to research how to prevent, detect, contest, and recover from the Glitch;

- loss of the opportunity to control how their personal information is used; and

- continuing risks to their financial health, which remains subject to further harmful inaccurate reporting as long as Equifax fails to undertake appropriate, legally required steps to protect and ensure the maximum possible accuracy when creating consumer reports using the personal information in its possession.

61.     The damages that Plaintiff and Class Members bear as a result of the Glitch cannot be rectified by merely updating the affected credit reports. In addition, while credit reporting agencies offer consumers one free credit report per year, consumers who request more than one credit report per year from the same credit reporting agency (such as Equifax) must pay a fee for the additional report. Such fees constitute out-of-pocket costs to Plaintiff and Class Members.

62.    Defendant's actions or inactions that allowed for the Glitch also violate its duties and obligations as a credit reporting agency under the FCRA, as described in detail herein. Each instance in which Equifax has failed to comply with Sections 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

63.    Further, though the Glitch was caused by an employee or agent of Equifax's "coding issue," Equifax continued to provide inaccurate credit scores and consumer reports when it knew or should have known that Plaintiff and Class Member's consumer reports and credit scores were inaccurate. Thus, Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A).

64.    This action seeks to hold Defendant accountable for its conduct and seeks vindication and recompense on behalf of the individual consumers who were harmed by Equifax's negligent and/or willful violations of the FCRA.

65.    Plaintiff seeks to recover FCRA statutory damages to the fullest extent allowable by law. In addition Plaintiff also seeks injunctive relief requiring Defendant to, inter alia, (i) conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Glitch; (ii) identify and notify each U.S. citizen who was affected by the Glich; (iii) provide a sum of money sufficient to provide quality credit repair services to each such

person for each of their respective lifetimes; (iv) establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Glitch; (iv) disgorge its gross revenue from transactions, including but not limited to the revenue derived from selling inaccurate consumer reports and credit scores to business clients and the earnings on such gross revenue; and (vi) discontinue its above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the causes of the Glitch.

66.    Plaintiff and Class Members have standing to sue as a result of Equifax's violations of federal and state statutes, including the FCRA, as detailed herein. Further, because of Equifax's acts and/or omissions, willful disregard and conduct, and want of ordinary care, and the resulting harm from the Glitch. Plaintiff and Class Members have suffered actual injury, have suffered (and will continue to suffer) economic damages and other injury and actual harm as described above.

## V.    CLASS ALLEGATIONS

67.    Plaintiff seeks relief on behalf of himself and all others similarly situated under Federal Rule of Civil Procedure 23(b)(1), (b)(2), (b)(3), and (c)(4). Pursuant to Fed. R. Civ. P. Rule 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a nationwide class defined as follows and subject to amendment as appropriate:

All individuals and entities in the United States whose credit score or consumer report was inaccurately reported or inaccurately provided to potential lenders as a result of "the Glitch" reported by Equifax to have occurred place between at least March 6, 2022 through April 6, 2022 ("the Class").

68.    Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

69.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

70.    The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

71.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief, the Class consists of thousands of individuals whose consumer reports were compromised as a result of the Glitch and millions of individuals whose accounts were insecurely maintained as a result of Equifax's FCRA violations. Additionally, millions of individuals experienced actual harm from Equifax's willful violation of FCRA in its refusal to remedy the Glitch or promptly mitigate it. Accordingly, members of

the Class are so numerous that joinder of all members is impracticable. Class Members may be identified from Defendant's records, including from Equifax's consumer accounts and enterprise services.

72.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether, during the class period, Equifax disclosed, or adequately disclosed, the Glitch to lenders or consumers;

b.    Whether Equifax used reasonable procedures to ensure that the information included on consumer credit reports was accurate;

c.    Whether Equifax's measures to ensure accurate consumer reports, violate the FTC Act or the FCRA;

d.    Whether Equifax's conduct violates the FCRA;

e.    Whether Equifax acted willfully or negligently when allowing the Glitch to continue without remedy;

f.    Whether Equifax has been unjustly enriched by its conduct;

g.    Whether Plaintiff and Class Members are entitled to injunctive relief to enjoin the unlawful conduct alleged herein; and

h.  Whether Plaintiff and Class Members have sustained damages as a result of Equifax's conduct and if so, what is the appropriate measure of damages or restitution.

73.  <u>Typicality</u>. Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were uniformly affected by Equifax's wrongful conduct in violation of law as complained of herein.

74.  <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiff and their counsel have no interest that is in conflict with, or otherwise antagonistic to the interests of the other Class members. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

75.  **Predominance.** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff and Class Members were impacted by Equifax's improper and inaccurate reporting of credit scores. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

76. **Superiority.** A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

77. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, damages, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## VI.   CAUSES OF ACTION

### COUNT I
### WILLFUL VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681, *et seq*
### (On Behalf of Plaintiff and the Class)

78. Plaintiff hereby incorporates Paragraphs 1 through 77 as if fully stated herein.

79.    In enacting the FCRA, Congress made several findings, including that consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit information and other consumer information. 15 U.S.C. § 1681(a)(4).

80.    At all relevant times, Equifax was a consumer reporting agency as defined by the FCRA. Under 15 U.S.C. §1681a(f), a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

81.    At all relevant times, Equifax had compiled and maintained a "consumer report" on Plaintiff and Class Members as defined by the FCRA. 15 U.S.C. § 1681a(d)(1). As defined in 15 U.S.C. § 1681a(d)(1), a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or

insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other purpose authorized by 15 U.S.C. § 1681b.

82.    As individuals, Plaintiff and Class Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

83.    As a consumer reporting agency, Defendant was (and continues to be) required to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard, protect and ensure the accuracy of the consumer credit information in its possession, custody and control, including Plaintiff's and Class Members' credit reports and credit scores. See 15 U.S.C. 1681(b).

84.    As a consumer reporting agency, Defendant's actions or inactions that allowed for the Glitch violate its duties and obligations as a credit reporting agency under the FCRA.

85.    Defendant's actions or inactions that allowed for inaccurate credit entries and or credit scores to be included on consumer reports also violate its duties and obligations as a credit reporting agency under the FCRA.

86.    As alleged herein, Defendant has engaged in a number of practices that, taken together, failed to use reasonable measures to provide for the maximum possible accuracy on consumer credit reports. Among other things, Defendant failed to:

a. Develop and disseminate comprehensive information integrity policies, including those related to information verification related to the consumer reports and credit scores of Plaintiff and Class Members;

b. Assess the risks of using code that could and would lead to inaccurate credit scores and/or consumer reports being sent to lenders;

c. take appropriate action to correct existing vulnerabilities or threats to personal information in light of known risks, especially those that lead to the Glitch.

87. The lack of such reasonable data integrity and security measures directly caused damages to Plaintiff and Class Members, as detailed herein.

88. By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendant willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq*. by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their Consumer Data and PII.

89. Defendant has violated 15 U.S.C.A. § 1681e(b) because, due to the Glitch, Defendant failed to "follow reasonable procedures to assure maximum

possible accuracy of the information concerning the individual about whom the report relates."

90.    Defendant repeatedly created inaccurate consumer reports as a result of the Glitch, Plaintiff and Class Members would not have suffered the harm as detailed herein.

91.    Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendant relied on its these procedures, which were unreasonable, and thus Defendant had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

92.    As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports. In each instance, Equifax was in violation of, Section 1681e of the FCRA.

93.    Equifax's willful failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of § 1681e(b).

94.    Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class members for failing to comply with the requirements that a consumer

reporting agency not disclose inaccurate consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports. Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial.

95.    In addition, Defendant's failure to comply with the foregoing requirements was willful because Defendant knew or should have known, but recklessly disregarded, that its information verification measures were inadequate and unreasonable and additional steps were necessary to protect Plaintiff and Class Members from the Glitch.

96.    Equifax's acts described herein constitute a pattern or practice of knowing violations, as set forth in Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A). Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

97.    Plaintiff and Class Members also are entitled to recover punitive damages, under 15 U.S.C. § 1681n(a)(2), and their attorneys' fees, litigation expenses, and costs under 15 U.S.C. § 1681n(a)(3).

## COUNT II
## NEGLIGENT VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681, *et seq*

**(On Behalf of Plaintiff and the Class)**

98.     Plaintiff incorporates paragraphs 1-77 as if fully set forth herein and alleges Count II in the alternative.

99.     By its above-described wrongful actions, inaction and omissions, want of ordinary care, and the resulting harm to Plaintiff and Class Members, Defendant willfully and recklessly violated the FCRA, 15 U.S.C. § 1681, *et seq.* by failing to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class Members' Equifax consumer accounts that contained their Consumer Data and PII and to ensure their accuracy.

100.     Defendant has violated 15 U.S.C.A. § 1681e(b) because, due to the Glitch, Defendant failed to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

101.     Defendant repeatedly created inaccurate consumer reports as a result of the Glitch, Plaintiff and Class Members would not have suffered the harm as detailed herein.

102.     Despite lacking sufficient testing procedures regarding the accuracy of the consumer reports and credit scores that would have prevented the Glitch, Defendant relied on its these procedures, which were unreasonable, and thus

Defendant had no reason to believe that all of the information it included its consumer report accurately pertained to the consumer who is the subject of the user's request.

103.   As a direct and proximate result of Equifax's actions and failures to act described herein, Equifax offered, provided, and furnished Plaintiff's and Class Members' inaccurate consumer reports. In each instance, Equifax was in violation of, Section 1681e of the FCRA.

104.   Equifax's failure to use reasonable information verification procedures resulted in a yet unknown number of inaccuracies on Equifax consumer account holder's credit reports, in violation of § 1681e(b).

105.   Under Section 1681 of the FCRA, Equifax is liable to Plaintiff and Class members for failing to comply with the requirements that a consumer reporting agency not disclose consumer reports and take measures designed to avoid the unauthorized disclosure of consumer reports. Equifax therefore is liable to Plaintiff and Class Members for their actual damages as a result of Equifax's failure to comply with the FCRA, as well as costs and reasonable attorneys' fees, in amounts to be proven at trial.

106.   Each instance in which Equifax has failed to comply with Section 607 of the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary damages.

107.    Plaintiff and Class Members also are entitled to recover damages and their attorneys' fees, litigation expenses, and costs, under 15 U.S.C. § 1681n(a)(3).

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all Class Members, request judgment against Defendant and that the Court grant the following:

a.    For an Order certifying the Class as defined herein, and appointing Plaintiff and his counsel to represent the Class;

b.    For an award of damages, including actual damages, nominal damages, statutory damages, compensatory damages, and punitive damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    For an Order for non-restitutionary disgorgement of all of Defendant's profits that were derived, in whole or in part, from Equifax's furnishment of inaccurate consumer reports;

d.    For an Order directing Defendant to disgorge revenues and profits wrongfully obtained;

e.    For an Order directing Defendant to, inter alia:

i.   conduct a full-system audit to properly identify which consumers' credit scores and consumer reports were affected by the Glitch;

ii.  identify and notify each U.S. citizen who was affected by the Glitch;

iii. provide a sum of money sufficient to provide quality credit repair services to each such person for each of their respective lifetimes;

iv.  establish a fund (in an amount to be determined) to which such persons may apply for reimbursement of the time and out-of-pocket expenses they incurred as a result of the Glitch;

v.   disgorge its gross revenue from transactions, including but not limited to the revenue derived from selling inaccurate consumer reports and credit scores to business clients and the earnings on such gross revenue; and

vi.  discontinue its above-described wrongful actions, inaction, omissions, want of ordinary care, nondisclosures, and the causes of the Glitch.

f.  For an award of reasonable attorneys' fees, costs, and litigation expenses pursuant to 15 U.S.C. § 1681n(a)(3), O.C.G.A. §13-6-11, and as otherwise allowed by law;

g.  For prejudgment interest on all amounts awarded; and

h.  Such other and further relief as this Court may deem just and proper.

## VII.   JURY TRIAL DEMAND

1.  Plaintiff hereby demands that this matter be tried before a jury.

DATED: August 8, 2022.                    Respectfully submitted,


THE FINLEY FIRM, P.C.

*/s/MaryBeth V. Gibson*
MaryBeth V. Gibson
Georgia Bar No. 725843
N. Nickolas Jackson
Georgia Bar No. 841433
3535 Piedmont Road
Building 14, Suite 230
Atlanta, GA 30305
Telephone: (404) 320-9979
Fax: (404) 320-9978

Gary M. Klinger*
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
227 Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

Nick Suciu III*
nsuciu@milberg.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Fax: (865) 522-0049

*pro hac vice forthcoming*

*Attorneys for Plaintiff*

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing pleading filed with the Clerk of Court has been prepared in 14-point Times New Roman font in accordance with Local Rule 5.1(C).

Dated: August 8, 2022.

*/s/ MaryBeth V. Gibson*
MaryBeth V. Gibson